IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

NICHOLAS WARD,

     Plaintiff,                        Case No. 1:24-cv-946-JMC-JMR

v.

INTERNATIONAL ALLIANCE OF THEATRICAL STAGE
EMPLOYEES, IATSE LOCAL 480, HAILEY ROY,

     Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES, IATSE LOCAL 480, AND HAILEY ROY'S <u>MOTIONS TO DISMISS</u>**

On January 17, 2025, defendant Hailey Roy moved to dismiss Plaintiff Nicholas Ward's second amended complaint for failure to state a claim. ECF No. 35. And on January 21, defendants International Alliance of Theatrical Stage Employees and New Mexico branch, Local 480, did the same. ECF Nos. 36, 37. For the reasons below, we GRANT IN PART and DENY IN PART their motions.

## I.    <u>Background</u>

Plaintiff Nicholas Ward is a film set technician and member of the International Alliance of Theatrical Stage Employees' ("the union") New Mexico Branch, Local 480 ("the Local"). ECF No. 34 ¶¶ 10, 11 ("Am. Comp."). Several officers and an executive board lead the Local. *Id.* ¶ 12. The executive board has several vice presidents, of which Plaintiff was formerly one. *Id.* ¶¶ 13, 17. Defendant Hailey Josselyn Roy, another Local member, became the Local's secretary treasurer in January 2023. *Id.* ¶ 18. The secretary treasurer lobbies for the Local at the New Mexico legislature. *Id.*

Roy created content for pornographic subscription website OnlyFans for three years before she became secretary treasurer. *Id.* ¶ 19. She did so openly, announcing it on Facebook and Instagram in posts Plaintiff saw. *Id.* ¶ 20. Other Local members and officers expressed concern about Roy's pornographic career to Plaintiff when she became secretary treasurer, worrying "about possible political backlash for the Local." *Id.* ¶ 21. Plaintiff discovered that some of Roy's pornography was publicly available with a Google search, and showed text-only search results to another vice president and the Local's business agent. *Id.* ¶ 24. The other vice president sought the union's attorney's advice on the matter, who responded that the union was "not touching this." *Id.* ¶ 25. He suggested voting Roy out of office at the next election. *Id.* Seeking help in finding a candidate to run, Plaintiff showed the search results to several other Local officers and, in one case, Roy's profile on another pornographic website to verify her identity. *Id.* ¶¶ 28–31. Though they eventually found a candidate, Roy won reelection. *Id.* ¶ 31.

An officer Plaintiff approached met with Roy in private about the issue. *Id.* ¶ 32. Roy immediately filed a disciplinary charge against Plaintiff for sexual harassment. *Id.* ¶ 34. Suspended from his vice presidency, Plaintiff met with two other board members. *Id.* Both advised him to resign as vice president, telling him that "if he were to face the charges, 'the consensus is that things will go badly for you.'" *Id.* The officer designated as Trial Chair later repeated this statement to him. *Id.* ¶¶ 41–42. Plaintiff received a charge sheet and Roy's affidavit soon after, accusing him of showing another vice president the pornography despite the allegedly salacious content merely being a photograph of her from a medical drama in which she appeared nude. *Id.* ¶¶ 53–64; 109. That act, alleged the charge sheet, violated the Local's sexual harassment policy, the Local's constitution's requirement that all officers must keep the best interests of the union's members in mind, and the constitution's general prohibition of "conduct unbecoming" a

2

union member. *Id.* ¶¶ 53–64. The charge sheet stated inaccurately that Plaintiff showed the relevant officer Roy's pornography on November 18, 2023; the event actually occurred on November 19, and someone corrected the error with a pen in the copy sent to Plaintiff. *Id.* ¶¶ 46–52.

Early signs validated the other officers' prediction that the trial would not go well for Plaintiff. He asked an officer to whom he showed Roy's pornography to testify on his behalf. *Id.* ¶ 44. The officer rebuffed him, stating that another vice president told him not to. *Id.* After a mediation attempt failed and Plaintiff had difficulty finding counsel, he requested a continuance. *Id.* ¶¶ 42; 87. In so doing, he argued that the various other officers' warnings that the trial would not favor him had infected the trial such that he would not get due process. *Id.* ¶ 78. The Local denied the request to drop the charges, but delayed the trial another eight days. *Id.* ¶ 79. Though Plaintiff found an attorney, only union members can represent members at disciplinary trials. *Id.* ¶¶ 68–71. Attempts to enroll the attorney as a union member proved unsuccessful after the Local gave Plaintiff the required paperwork only days before trial and did not process it in time once Plaintiff hurriedly completed it. *Id.*

The members the Local assigned Plaintiff in the attorney's stead also did not forecast success, as one of them lived out of state and would not be present at trial. *Id.* ¶ 74. The out of state member even received a phone call stating that Roy planned to use the trial as groundwork for a lawsuit against Plaintiff, and that she would also sue the member if he represented him at the disciplinary hearing. *Id.* ¶ 75. Despite a constitutional requirement that disciplinary trials be open

to all members, the Local invoked another constitutional provision to close the trial.[1]  *Id.* ¶ 80.  The union's president later sent a letter supporting that decision.  *Id.* ¶ 89.

The trial did not go well for Plaintiff.  His lone union-assigned counsel in New Mexico at the time of trial had to withdraw because of a scheduling conflict, and while the Local found him another counsel, it did so only three days before trial and again denied him a continuance despite the change.  *Id.* ¶ 96–99.  Roy testified that "her nude [medical drama] appearance [was] 'the only publicly [available] thing that would be of [her] out there,'" *id.* ¶ 109 (quoting Trial Transcript at 120), and that "the only way [Plaintiff] could have known about nude images of [her] circulating online . . . was if he was cyberstalking [her] and subscribing to her OnlyFans account," *id.* ¶ 111.  She did so despite admitting that she announced her OnlyFans career publicly.  *Id.*  She also said that Plaintiff demeaned her behind her back "for years," and implied that she reported him to avoid being subject to physical violence.  *Id.* ¶ 121–23.  One vice president to whom Plaintiff showed the Google search results displaying Roy's pornography also testified, stating that, though Plaintiff did show her the search results indicating Roy had a pornographic career, he never showed her any nude images of Roy.  *Id.* ¶ 104.  The trial board found him guilty, and recommended the Local remove him from the executive board permanently, that he complete sexual harassment training, and that he pay a $5,000 penalty.  *Id.* ¶ 126.

Plaintiff appealed the decision to the union's president.  *Id.* ¶ 137.  Roy also appealed, demanding the union punish Plaintiff more harshly.  *Id.* ¶ 145.  The union president denied both appeals, but stated:

---

[1] That constitutional provision stated that "[c]harges alleging deliberate acts or conduct, which materially interfere with Article One, Section 3, paragraph 5 of this Constitution need not . . . be conducted before the members of a local union in open meeting."  Am. Comp. ¶ 80.  Article One, Section 3, paragraph 5 forbids sex discrimination, which the Local argued was at issue here.  *Id.*

the allegations regarding stalking and cyber security/privacy issues might well raise violations of local, state and federal laws, which are beyond the internal union disciplinary process.  Thus, if [Plaintiff]'s conduct also violated state and federal law, [Roy] might well have other avenues of relief that are available to her.

*Id.* ¶ 148.  According to Plaintiff, the president effectively advised Roy to sue him.  *Id.* ¶ 149.

While all this went on, Roy petitioned for a restraining order against Plaintiff in state court. *Id.* ¶ 156.  Her petition repeated the allegations from the union trial: Plaintiff "stalk[ed] [her] online since 2021" and showed "pirated images of [her]" to another union member.  *Id.* ¶¶ 156, 162. Plaintiff incurred $5,000 in attorney's fees fighting the petition.  *Id.* ¶ 166.  Roy eventually withdrew the petition because she was "no longer living in New Mexico," a claim Plaintiff disputes.  *Id.* ¶¶ 169–71.

Plaintiff sued the union, the Local, and Roy for their actions.  ECF No. 1.  After Plaintiff amended his complaint to add several new claims, ECF No. 4, all three defendants moved to dismiss for failure to state a claim, ECF No. 11; ECF No. 12; ECF No. 20.  With Court leave, Plaintiff amended again, ECF No. 34, and all three defendants again moved to dismiss for failure to state a claim, ECF No. 35 ("Roy's Mot."); ECF No. 36 ("Union's Mot."); ECF No. 37 ("Local's Mot."), after the Court denied their prior motions as moot, ECF No. 33.

Plaintiff raises claims under 29 U.S.C. § 411 and 18 U.S.C. § 1962, which gives the Court federal question jurisdiction under 28 U.S.C. § 1331.  Plaintiff also raises claims under New Mexico law for defamation and malicious abuse of judicial process.  Am Comp. ¶¶ 264–77.  As these "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy" as those Plaintiff brought under federal law, we have supplemental jurisdiction over them under 28 U.S.C. § 1367.

## II.    Applicable Law

Defendants all seek dismissal for the same reason: failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The Court must dismiss a complaint if it lacks "sufficient factual allegations 'to state a claim to relief that is plausible on its face.'"  *Doe v. Woodard*, 912 F.3d 1278, 1299 (10th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, a complaint fails to state a claim if Plaintiff could not recover under the stated counts even if the Court assumed that all well-pled facts were true and drew all reasonable inferences in his favor.  *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017).

## III.    Discussion

Plaintiff's complaint has three sets of claims.  First, he claims the union and the Local violated various parts of the Labor-Management Reporting and Disclosure Act ("LMRDA"), specifically its prohibitions against improper discipline and deprivations of freedom of speech and equal rights.  Second, he argues that the Local committed mail and wire fraud in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Finally, he contends that Roy defamed him and maliciously abused the judicial process in violation of New Mexico law.  We address each in turn.

### A.    LMRDA Claims

The LMRDA is a "Bill of Rights" for union members, *Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen & Packers v. Crowley*, 467 U.S. 526, 528 (1984), meant to prevent "abuses of power by union leadership," *Sheet Metal Workers' Int'l*

*Ass'n v. Lynn*, 488 U.S. 347, 352 (1989).  Among these are "equal rights to vote and otherwise participate in union decisions, freedom from unreasonable restrictions on speech and assembly, and protection from improper discipline."  *Crowley*, 467 U.S. at 536–37 (citing *United Steelworkers of America v. Sadlowski*, 457 U.S. 102, 103, 109–10 (1982); *Finnegan v. Leu*, 456 U.S. 431, 435–36 (1982)); *see also* 29 U.S.C. § 411.

Despite the statute's ambitious language, courts have construed the act to give wide berth to unions in "recognition of an overarching interest in maintaining the integrity and effectiveness of the union as the collective representative of all of its members."  *Aircraft Mechanics Fraternal Ass'n v. Transp. Workers Union of Am., Loc. 514, Air Transp. Div.*, 98 F.3d 597, 600 (10th Cir. 1996).  Indeed, the Supreme Court has said the LMRDA permits unions to "discipline its members for offenses not proscribed by written rules at all . . . ."  *Int'l Bhd. of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers v. Hardeman*, 401 U.S. 233, 244–45 (1971).

Plaintiff alleges the Local and the union violated the LMRDA's improper discipline prohibition by failing to "serve[] [him] with written specific charges," "give[] [him] a reasonable time to prepare his defense," and "afford[] [him] a full and fair hearing."  Am. Comp. ¶¶ 218–20 (citing 29 U.S.C. § 411(a)(5)(A–C)).  The claim's thrust is a lack of due process.  He alleges several incidents and violations of the Local's constitution and union procedures that suggested the trial against him would be a sham, such as that a judge of his own trial told him before it that he would not get a favorable result.[2]  *Id.* ¶ 42; ECF No. 40 ("Plaintiff's Resp.") at 10–14.  Plaintiff

---

[2] As Plaintiff explains, "[w]hile the [Union], in its motion, addresses only Counts I – III, ECF No. 36, the Local, in its motion, addresses Counts I – V.  ECF No. 37.  As to Counts I – III, the two motions are identical.  Thus, Plaintiff's prior response brief, ECF No. 40 (in opposition to the [union]'s motion) addresses Counts I – III as they pertain to both Defendants."  ECF No. 41 at 2.  All citations to Plaintiff's response will be to his response to the union's motion when discussing his LMRDA claims unless otherwise specified.

also alleges that the union and the Local violated his LMRDA-protected right to free speech and assembly by punishing him for expressing concern with Roy's pornographic career and showing evidence of it to fellow union members.  Am. Comp. ¶¶ 226–33; Plaintiff's Resp. at 14–20. Finally, he alleges the union and the Local "subjected Mr. Ward to retaliatory discipline and stripped him of the right to run for union office, for exercising his rights under 29 U.S.C. § 411(a)(1)," which violates his "equal rights and privileges within the union to nominate candidates, to vote in elections or referendums of the union, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings . . . ."  Am. Comp. ¶¶ 235–36; Plaintiff's Resp. at 21–22.

    The Local argues, albeit only in a footnote in its reply brief, that Plaintiff's three LMRDA claims fail from the outset because it is "settled law that the statute does not apply to union proceedings to oust union leaders from office," and "Plaintiff's membership rights are unaffected." ECF No. 43 at 2 n.2 (quoting *Iron Ship Builders, Blacksmiths, Forgers & Helpers v. Baca*, 122 F.4th 1224, 1236 (10th Cir. 2024)).  But though the Local removed Plaintiff from his officer position as punishment for his offenses, it tried and convicted him of the offenses as a rank-and-file union member.  ECF No. 34-6 at 1–4 (describing the charges for which the Local convicted Plaintiff, which included violations of the "Duties of Members" and the Local's sexual harassment policy, which applied to all union members).  Courts hold that "[i]t is readily apparent, both from the language of these [LMRDA] provisions and from the legislative history of Title I [of the LMRDA], that it was rank-and-file union members—not union officers or employees, as such— whom Congress sought to protect."  *Finnegan*, 456 U.S. at 436–37.  The LMRDA rights Plaintiff asserts—due process, improper discipline, free speech, and equal rights—are all rights he asserts as a union member.  Am. Comp. ¶¶ 217–41.  For example, though his punishment for his actions

included being removed from office, it also included a $5,000 fine and sexual harassment training. ECF No. 34-6 at 4.  The LMRDA protects the right of every union member to be free of improper discipline, and Plaintiff argues these punishments were the result of such improper discipline.  And "a union officer 'may recover under [the LMRDA] . . . to the extent that his membership rights were affected by the union disciplinary proceeding.'"  *Baca*, 122 F.4th at 1236 (quoting *Gesink v. Grand Lodge, Int'l Ass'n of Machinists & Aerospace Workers*, 831 F.2d 214, 217 (10th Cir. 1987)).

### 1. Count One: Improper Discipline and Due Process Claim

The union and the Local argue that Plaintiff fails to state a claim because all the deficiencies he identified with the trial are not actionable under the LMRDA.  They defend the charging document, for example, as sufficiently illustrative to satisfy due process because it "included a description of [Plaintiff]'s alleged misconduct, and it informed him that a hearing would be conducted pursuant to the IATSE International and Local 480 Constitutions" rather than "confin[ing] itself to a mere statement or citation of the written regulation that [Plaintiff] was said to have violated."[3]  Union's Mot. at 11 (quoting *Hardeman*, 401 U.S. at 245).  They also argue that the twenty-nine days Plaintiff had to prepare for the trial were more than sufficient, and that he has not sufficiently alleged that various violations of the union's trial handbook and constitution significantly prejudiced him.  *Id.* at 11–14.  As for the trial itself, the union and the Local contend that the LMRDA "does not require 'the specific protections associated with judicial proceedings' or 'the full panoply of procedural safeguards found in criminal proceedings,'" just an opportunity to "put on a full-throttle defense" represented by an attorney.  *Id.* at 15 (quoting *Kent v. New York*

---

[3] As with Plaintiff's response to the various motions, the Local's and the union's motions overlap in arguing against Plaintiff's LMRDA claims.  This order cites only to the union's motion except otherwise specified.

*State Pub. Employees Fed'n*, 612 F. Supp. 3d 50, 71 (N.D.N.Y. 2020)).  Given the deference the LMRDA affords unions, they argue, any attempt to relitigate the trial would be no better than reweighing the evidence, which the statute forbids.  *Id.* at 18 (citing *Kent*, 612 F. Supp. 3d at 72).

The Court disagrees.  The union and the Local are correct that we must not interfere with internal union decision-making, that the LMRDA protects "only essential [due process] standards . . . and that in establishing those standards, great care should be taken not to undermine union self-government."  *Sadlowski*, 457 U.S. at 117.  But that deference goes only so far. Although it may counsel accepting a union's policymaking and interpretation of its own constitution and prohibitions, the LDMRA allows courts to scrutinize the process by which it punishes its members to some degree.  *Hardeman*, 401 U.S. at 244–45 (stating that the LDMRA "obviously empowers the federal courts to examine those provisions and determine whether the union member had been misled or otherwise prejudiced in the presentation of his defense.").

Some of Plaintiff's allegations are mere policy disagreements.  He alleges, for example, that he "had not sexually harassed Roy" in violation of Local policy by showing the other Local officers the Google search results indicating that Roy created pornography.  Am. Comp. ¶ 56.  The LDMRA forbids the Court from scrutinizing whether Plaintiff's actions were sexual harassment under the Local's rules.  *Hardeman*, 401 U.S. at 245.  Plaintiff has also not alleged an actionable claim that the union and the Local failed to give him adequate notice of the charges against him. The LDMRA requires only that the charges provided be "specific enough to inform the accused member of the offense that he has allegedly committed."  *Id.* at 245.  The charges here did so, stating that Plaintiff showed another vice president "a screenshot of a porn site on his phone, [which] he claimed [ ] was salacious content of [her]," and describing the provisions she alleged he violated.  ECF No. 34-4 at 1.  Even assuming Plaintiff's allegation is true that Roy's trial

10

testimony went beyond the scope of this incident by "accus[ing] [him] of cyberstalking [her]," Am. Comp. ¶ 113, the trial body convicted him of exactly what the charging affidavit mentioned: "sharing sexually explicit content related to [Roy] with other members," ECF No. 34-6 at 4. Plaintiff had enough warning about the trial's contents and of what Roy accused him.[4]

Plaintiff pleads many other facts, however, that state a plausible claim that the Local and the union denied him a full and fair hearing. Assuming that all the complaint's factual allegations are true and construing all reasonable inferences in his favor, Plaintiff has alleged a disciplinary process with a sham trial in which the decision-making members made up their minds before Plaintiff even had a chance to defend himself. Am. Comp. ¶ 42 (alleging that one of the executive board members, at the time the trial chair, Am. Comp. ¶ 41, "stated that if the case goes to trial 'the general consensus is that it won't go well for you.'"). He alleges that another officer to whom he showed the Google search revealing Roy's pornographic activities refused to testify on his behalf because "he . . . had been told by [then-VP Pat] Daily not to." *Id.* ¶ 44. Plaintiff attempted to get his chosen attorney reinstated as a member, only to have the Local provide the paperwork two weeks later days before trial and neither process nor approve the reinstatement. *Id.* ¶¶ 69–71. Local leadership also maintained Plaintiff was "not required to have representation at trial," despite having that right under the union and the Local constitutions. *Id.* ¶ 88. The counsel it provided him was inadequate. One lived out of state, and another had to withdraw because of scheduling conflicts, leaving the counsel that did argue only three days to prepare. *Id.* ¶¶ 88, 96–99. Plaintiff's

---

[4] Contrary to Plaintiff's argument, "some evidence" exists for the charges levied against him. Plaintiff's Resp. at 11–12; *Hardeman*, 401 U.S. at 246 (stating that unions need only provide "some evidence" of the charges to satisfy the LDMRA). The complaint itself says that one of the Local's vice presidents "testified that [Plaintiff] showed her a screenshot of a porn site that appeared to show Roy." Am. Comp. ¶ 103. This could support the Local's charge that Plaintiff "shar[ed] sexually explicit content related to Roy with other members." ECF No. 34-6 at 4.

continuous allegation that the Local violated both its and the union's constitution's procedures, a charge neither the union nor the Local denies, *see* Union's Mot. at 9, merely compound the issue.

Due process requires that the tribunal hearing a case operate with an open mind and be reasonably free of bias. *Wildberger v. Am. Fed'n of Gov't Emps.*, 86 F.3d 1188, 1193 (D.C. Cir. 1996). Because union disciplinary processes are often insular to their limited membership, the LMRDA does not require the "full panoply of procedural safeguards" and judicial disinterest present in most courts. *Tincher v. Piasecki*, 520 F.2d 851, 854 (7th Cir. 1975). Plaintiff's complaint alleges sufficient facts that indicate that the Local and the union violated even this lesser standard. The complaint portrays a disciplinary trial in which Plaintiff's fate seemed sealed from the outset in a process riddled with various procedural insufficiencies. This conduct, if true, is exactly the "widespread abuse[] of power by union leadership" that the LDMRA sought to eliminate. *Crowley*, 467 U.S. at 536 (quoting *Finnegan*, 456 U.S. at 435). Although discovery may reveal the union and the Local's conduct to be reasonable, the complaint states a plausible claim for relief. We thus deny the union and the Local's motions to dismiss count one.

### 2. Count Two: Free Speech Claim

The LDMRA protects free speech to a much lesser extent than does the First Amendment. The statute says that:

> [e]very member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings.

29 U.S.C. § 411(a)(2). The statute limits this free speech right:

> [N]othing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

*Id.* Citing the Supreme Court's observation that a "union rule is valid as long as the union has a 'reasonable basis for its decision' to implement [it]," the Local and the union argue that the sexual harassment prohibition by which they disciplined Plaintiff was such a reasonable rule.  Union's Mot. at 20 (citing *Sadlowski*, 457 U.S. at 118).  The union and the Local also deny they disciplined Plaintiff because of his speech, doing so instead because his choice to show other Local members evidence that Roy acted pornographically created "an uncomfortable environment for [Roy] to work in."  *Id.* at 21.

These arguments are insufficient.  Plaintiff contends that "[e]very member of any labor union has the right to meet and assemble freely with other union members . . . to express at union meetings his views[] upon candidates in union elections," and that the union and the Local both violated this right by punishing him for speaking out against Roy's candidacy.  Am. Comp. ¶ 227.  He does not contest that the Local and the union can promulgate reasonable rules that limit its members' free speech or that the sexual harassment policy under which the Local charged him could be reasonable, arguing instead that his only real offense was that he "attempted through democratic means to unseat a union officer because she was publicly performing in pornography."  Plaintiff's Resp. at 18.

The charging documents make clear that Plaintiff's offending conduct was "show[ing] [the other vice president] a screenshot of a porn site on his phone [and] claim[ing] there was salacious content of [Roy] on these sites," ECF No. 34-4 at 1, not the mere act of expressing concern with Roy's pornographic career's effect on her duties as secretary treasurer.  The provision the Local cited as the basis for charging Plaintiff stated specifically that his offense was "distributing intimate or sexual information about another person without that person's consent."  *Id.*  Though Plaintiff denies showing any other members pornographic images, he admits that he showed one

of his fellow officers what he believed was Roy's profile on a pornographic website. Am. Comp. ¶ 29. To the extent the LMRDA would protect such conduct as speech, it "expressly qualifie[s] [protection of those rights] by recognition of an overarching interest in maintaining the integrity and effectiveness of the union as the collective representative of all of its members." *Aircraft Mechanics Fraternal Ass'n*, 98 F.3d at 600. Rules such as the Local's punishing sexual harassment can be reasonable, as they protect the union's vital interest in maintaining harmony among its members even though doing so may infringe upon some members' free-speech rights. *Sadlowski*, 457 U.S. at 115 (upholding a union rule because "[a]lthough the outsider rule may implicate rights protected by § 101(a)(2), it serves a legitimate purpose that is clearly protected under the statute.").

But the fact that the union and the Local punished Plaintiff pursuant to a reasonable rule does not undermine his claim. Plaintiff maintains he "amply allege[d] 'a calculated and deliberate scheme to discourage dissent'" within the Local and the union. Plaintiff's Resp. at 18 (quoting *Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Misc. Workers, Greater New York & Vicinity, Loc. Union No. 812*, 2019 WL 1228056, at *24 (S.D.N.Y. Mar. 15, 2019)). He cites the same allegations he used to support his due process claim as evidence, observing that "[i]t is easy to see how (in a film industry union, in the era of the MeToo movement) the other Local officers who engaged with [him] in the exact same democratic activity were eager to keep the heat off themselves, and let [Plaintiff] take it." *Id.* (internal citations omitted).

In isolation, such accusations do not help Plaintiff. Although the various irregularities and alleged flaws with his trial plausibly suggest he may not have received a full and fair trial, they do not alone plausibly suggest a "deliberate scheme to suppress dissent" as Plaintiff claims. *Id.* Indeed, the complaint itself states that the union encouraged the Local to settle the issue

14

democratically.  Am. Comp. ¶ 25 (alleging that the union's attorney said the "recourse was electoral, i.e., to vote Roy out of office at the next election").  And although Plaintiff says that "other Local officers . . . engaged with [him] in the exact same democratic activity," the most the complaint alleges is that others also had concerns about Roy's pornographic activities' effect on the Local's political fortunes.  Plaintiff's Resp. at 18.  Only Plaintiff shared pornographic websites featuring Roy to his colleagues, and so the Local punished only him.  The allegations about his punishment, without more, would not plausibly suggest the conspiracy Plaintiff alleges.

Plaintiff's first amended complaint contained this deficiency, but Plaintiff's second amended complaint fixes it.  It adds background information about prior intra-Local squabbles between various officers in what Plaintiff describes as "Self-Dealing, Retaliatory Discipline and Undemocratic Practices."  Am. Comp. ¶¶ 172–92.  One allegation says that:

> [s]ubsequent to [Plaintiff]'s trial, a Local 480 member who was vocal in support of [Plaintiff] during the disciplinary process was blacklisted for supporting [him]. This person has not been offered work by the Local since roughly the time of the trial, was fired from a union contract job at the behest of two Exec. Board members shortly after the trial, and wishes not to be named in connection with these matters (and wishes that the Exec. Board members at whose behest the firing occurred not be named) for fear of being identified and further retaliated against.

*Id.* ¶ 192.  Assuming this allegation is true, Plaintiff has stated a plausible free speech-denial LMRDA claim based on a deliberate scheme to suppress dissent.  Punishing a single union member for sexual harassment does not suggest either the Local or the union did so because of the speech associated underlying that sexual harassment.  But that activity may plausibly suggest a broader scheme designed to discourage dissent in violation of the LMRDA's free-speech protections if paired with other actions suggesting broader actions without a reasonable basis and unrelated to enforcing reasonable internal rules.  *See Franza v. Int'l Bhd. of Teamsters, Loc. 671*, 869 F.2d 41, 45 (2d Cir. 1989) (observing that "the question [in LMRDA free speech cases] is whether an action

against the official is merely an isolated act of retaliation for political disloyalty or is instead part of a purposeful and deliberate attempt to suppress dissent within the union.") (citing *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973)). Blacklisting another Local member because of his support for Plaintiff during the trial certainly supports an inference that the Local and the union intended to suppress dissent regarding the incident.

The union and the Local's arguments that the sexual harassment rule by which it punished Plaintiff was reasonable are inapposite. Even if the Local punished Plaintiff with a reasonable rule, "where a union's discipline involves charges that intertwine allegations of disruptive conduct and protected speech, the discipline 'as a whole' is invalid under the LMRDA." *Schermerhorn v. Loc. 100, Transp. Workers Union of Am.*, 91 F.3d 316, 324 (2d Cir. 1996) (quoting *Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F.2d 13, 16, 18 (2d Cir.), cert. denied, 469 U.S. 1087 (1984)). That is exactly what Plaintiff pleads. We need not answer whether Plaintiff's conduct was sexual harassment under the Local's rule because Plaintiff claims the Local and the union only applied the rule as part of a deliberate scheme to suppress dissent about the propriety of Roy's OnlyFans activities and her fitness for union office, as evidenced by the trial procedures and allegedly blacklisting another union member who supported Plaintiff. The union and the Local may be correct that "it was not Plaintiff's act of speaking to, and showing, others about Ms. Roy's pornography that was in violation of [the Local]'s reasonable rules, but rather that this created an uncomfortable environment for Ms. Roy to work in," but these are factual questions the Court cannot answer now. Union's Mot. at 18.

At this litigation stage, we assume Plaintiff's blacklisting allegation is true. *Doe*, 912 F.3d at 1299. By so doing and construing all reasonable inferences in his favor, Plaintiff has plausibly

16

stated an LMRDA free-speech claim.  The Court denies the union and the Local's motions to dismiss count two.

### 3.  Count Three: Equal Rights Claim

The LMRDA gives every union member "equal rights and privileges . . . to nominate candidates, to vote in elections or referendums . . . , to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings . . . ."  29 U.S.C. § 411(a)(1).  Plaintiff argues the union and the Local violated his equal rights when they "subjected [him] to retaliatory discipline and stripped him of the right to run for union office."  Am. Comp. ¶ 236.  In so doing, they also violated his equal right to "to nominate candidates, to vote in elections or referendums of the union, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings."  *Id.* ¶ 235.

Though Plaintiff's other LMRDA counts state a claim, this one does not.  First, "[i]t is readily apparent . . . that it was rank-and-file union members—not union officers or employees, as such—whom Congress sought to protect" in passing the LMRDA's equal right protection provision.  *Finnegan*, 456 U.S. at 436–37.  To the extent he bases his claim on restrictions on his ability to consult fellow officers or use his office, his claims are therefore not actionable.  Second, his complaint does not support the allegation that the Local punished him alone for conduct others also did.  As explained above, it punished him for sharing images of Roy's profile on a pornographic website, which the complaint alleges no other member or officer did.

Finally, the Local's penalty did not forbid him from nominating candidates, voting in union elections, or participating in the other internal union activities the LMRDA protects.  It only removed him from his officer position, forbade him from running for further office, demanded he attend sexual harassment training, and fined him $5,000.  ECF No. 34-6 at 4.  The union even

denied Roy's proposed harsher penalty that might have infringed these rights. Am. Comp. ¶¶ 145, 155 (stating that the union president "only addressed the timeliness of the July 23, 2024 email, ignoring its content, and the content of Mr. Ward's initial appeal letter sent March 11, 2024," and hence denied Roy's suggestion that Plaintiff deserved to "be stripped of [union] membership altogether."). Plaintiff nevertheless argues the Supreme Court "later clarified that, 'Title I of the LMRDA was specifically designed to protect the union member's right to seek higher office within the union,'" and his punishment barring him from running for future offices violated that right. Plaintiff's Resp. at 21 (quoting *Hall v. Cole*, 412 U.S. 1, 14 (1973)). But the LMRDA limits that right by requiring union members to adhere to "reasonable rules." 29 U.S.C. § 411(a)(1). And as described above, the Local's sexual harassment policy is one such rule. Plaintiff's complaint does not state an LMRDA equal rights claim, and the Court grants the union and the Local's motions to dismiss count three.

### 4.   Defendants' Liability-Avoiding Arguments

Both the union and the Local claim Plaintiff's case suffers from defects that prevent them from being held liable for their conduct. The union insists repeatedly that it is not a proper party, as it states it "had nothing to do" with the conduct the complaint alleges. Union's Mot. at 2, 8, 10, 13, 14. The Local alone, it argues, performed all the conduct related to the trial and discipline at the heart of Plaintiff's LMRDA claims, limiting its role to the appeal. *Id.* at 8–10. But as the union itself admits, it can be held liable if it ratifies the Local's decision. *Id.* at 9; *Aircraft Mechanics Fraternal Ass'n*, 98 F.3d at 599 n.4 (stating that although "it is the local union imposing the challenged discipline that is the proper defendant, although the international union may *also* be subject to suit if it participated in, ratified, or exerted sufficient control over the local's action."). Plaintiff alleged many times in which the union ratified the Local's decisions, and the union admits

to some.  The complaint specifically alleges that the union approved the Local's decision to have a closed trial despite Plaintiff's objections, and that the union president to whom he appealed stated that he "reviewed the trial record and s[aw] no reason to disturb the findings of the Trial Board," denying his appeal for that reason and alleged untimeliness.[5]  Am. Comp.  ¶¶ 152, 155.  These sufficiently allege that the union ratified the Local's decision.

Both the union and the Local also argue that Plaintiff's case cannot proceed because he did not exhaust the remedies internal to the union and its Local.  The union constitution allows members to "appeal[] directly to the IATSE International President, . . . [then] the General Executive Board or to the Alliance in convention."  Union's Mot. at 24; Local's Mot. at 21–22.  But the LMRDA states only that union members seeking to sue for violations of their protected rights must "exhaust reasonable hearing procedures (*but not to exceed a four-month lapse of time*) within such organization, before instituting legal or administrative proceedings against such organizations . . . ."  29 U.S.C. § 411(a)(4) (emphasis added).  The Supreme Court has stated that "public tribunals whose aid is invoked may in their discretion stay their hands for four months, while the aggrieved person seeks relief within the union."  *N.L.R.B. v. Indus. Union of Marine & Shipbuilding Workers of Am., Loc. 22*, 391 U.S. 418, 426 (1968).  Plaintiff pursued the internal appeals process for more than four months before he brought this suit, and therefore sufficiently exhausted his remedies within the union.  ECF No. 34-6 at 1 ("On February 13th, 2024, it was the decision of the Trial Board, upon all testimony presented at the trial, that [Plaintiff] is guilty as

---

[5] The union's motion to dismiss states that it was not "involved at all in Plaintiff's disciplinary hearing (aside from [it]s decision to close the trial)."  Union's Mot. at 9.  But Plaintiff complains that the decision to close the trial was one of many procedural errors that prevented him from obtaining a full and fair hearing in violation of the LMRDA.  Am. Comp. ¶¶ 135–55.  The union's decision, among others, ratified the errors that allegedly gave Plaintiff an unfair trial.

charged."); Am. Comp. ¶ 155 (denying Plaintiff's appeal to the union president on September 17, 2024); ECF No. 1 (initiating this lawsuit on September 24, 2024).

### B. Counts Four and Five: RICO Claims

Against only the Local, Plaintiff brings two RICO claims for mail and wire fraud.  Am. Comp. ¶¶ 242–63.  He bases both on the Local's decision to "Fraudulently Alter Their Charging Affidavit," *id.* ¶¶ 46–52, and send it through both mail and email to further a "fraudulent scheme to deprive union members and officers including Mr. Ward of their property including their money, and their rights under the constitution and bylaws of [the union]," *id.* ¶¶ 248, 259.  The Local and the union, he argues, conspired in a criminal enterprise whose racketeering caused Plaintiff damages for which he hopes to recover civilly against only the Local.  *Id.* ¶¶ 248, 259.  He portrays the Local and the union as a classic criminal organization, restating facts alleged already like that the Local's Executive Board "threatened [him] with a sham proceeding," "intimidated and dissuade[d] . . . witnesse[es] from testifying," and "falsified the charging affidavit" while making "use of both the wires and the United States Postal Service" to "fine[] [him] five-thousand dollars." ECF No. 41 ("Plaintiff's Local Resp.") at 4–5 (internal citations omitted).

The Local finds many flaws with Plaintiff's pleadings.  First, it argues that he failed to plead both mail and wire fraud with particularity, specifically lacking any allegation that it "obtained any money or property from Plaintiff or anyone else," and that Plaintiff did not explain what made changing the affidavit material.  Local's Mot. at 24 (citing *United States v. Allen*, 554 F.2d 398, 410 (10th Cir. 1977)).  Second, it argues that Plaintiff failed to allege a "pattern of racketeering activity" with "at least two predicate acts" as the statute requires.  *Id.* (first citing 18 U.S.C. § 1961(5); then citing *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003)).  It notes that "while two acts are necessary, they may not be sufficient to establish a

20

pattern," and though "Plaintiff alleges that Local 480 fraudulently altered affidavits[,] [it] does not allege any details of how this is a 'pattern' that creates the 'threat of continuing activity.'" *Id.* at 24–25 (quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016)). Finally, it argues that Plaintiff failed to adequately allege that the union and the Local established an organized enterprise. *Id.* at 25. It argues that Plaintiff's allegations do not show "anything other than [the Local] conducting its own affairs and moving the discipline forward," *id.* at 26, referencing courts holding that "a 'defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO "person" and the RICO "enterprise,"'" *id.* at 25 (quoting *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1149 (10th Cir. 1998)).

The RICO Act is a broadly written statute with organized crime at its heart. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989). The law allows organizations and their members to be indicted and held civilly liable for conduct incident to ongoing criminal enterprises and racketeering even if the prosecution or plaintiff lacks sufficient evidence that the defendant committed the crimes underlying the entire enterprise.[6] *Tal v. Hogan*, 453 F.3d 1244, 1261–62 (10th Cir. 2006). As relevant here, a civil RICO plaintiff "must allege [the defendants] '(1) [participated in the] conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). For liability, "the defendant[] must have participated in the operation or management of the RICO enterprise," *BancOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1100 (10th Cir. 1999), "although it is not

---

[6] In the classic example, prosecutors could indict a mob boss under RICO for an ongoing criminal enterprise for orders he gave to his underlings in furtherance of a criminal enterprise even if the prosecutors lacked sufficient evidence to convict him of the larger crimes the enterprise committed.

necessary for the participant to have significant control," *Resol. Tr. Corp. v. Stone*, 998 F.2d 1534, 1541 (10th Cir. 1993) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 179 n.4 (1993)). "Racketeering activity" includes all crimes listed in 18 U.S.C. § 1961(1), while a "pattern" requires at least two racketeering acts committed within ten years of each other. *Johnson v. Heath*, 56 F.4th 851, 858 (10th Cir. 2022) (citing 18 U.S.C. § 1961(5)).

Plaintiff pled mail and wire fraud, the two crimes in which Plaintiff alleges the union and the Local engaged, with particularity. *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023) (citing *Tal*, 453 F.3d at 1263). Under RICO, that meant pleading "(1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury." *BancOklahoma*, 194 F.3d at 1103. Particularity includes "set[ting] forth the time, place[,] and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *In re Edmonds*, 924 F.2d 176, 180 (10th Cir. 1991).

Plaintiff alleges some necessary RICO elements. The Local may aptly compare the relationship between a union and its local to that between a corporation and its subsidiary, and may note their normal operations are not usually sufficient to constitute a criminal enterprise, but Plaintiff's allegations adequately plead this rule's exception. Criminal enterprises require two parties: "(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1176 (10th Cir. 2019) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)). Corporations and their subsidiaries are not normally enterprises under RICO because "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and

apart from itself." *Id.* at 1185 (quoting *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*, 883 F.2d 132, 141 (D.C. Cir. 1989)).  Logically, then, corporations and their subsidiaries, or in this case unions and their locals, can create a criminal enterprise if they collaborate to perform criminal acts atypical of their usual relationship and procedures.  *Care One Mgmt. LLC v. United Healthcare Workers E.*, 43 F.4th 126, 139–45 (3d Cir. 2022) (holding a labor union and its members could operate a criminal enterprise if they committed various criminal acts together).  Plaintiff's allegations, if true, state that the Local fraudulently altered an affidavit, sent it through the mail several times, and committed "multiple related acts of mail fraud" to aid a large plot to punish him illegally.  Am. Comp. ¶¶ 46–52, 251.  Such illegal acts are not typical union-local procedures and interactions and, if true, could be a RICO criminal enterprise.

Plaintiff's complaint does not explain the relationship between the crimes alleged and the overall enterprise, however.  Describing the fraud he alleges, Plaintiff argues that "the Local took cognizance of the charges against him, . . . immediately falsified the charging affidavit," and "subject[ed] [him] to a union disciplinary trial with a pre-determined outcome" to "defraud" him.  Plaintiff's Local Resp. at 4 (citing Am. Comp. ¶¶ 34, 42–52, 126, 194–99).  As for the mail and wire fraud, he alleges that the Local changed Roy's original affidavit with a pen to clarify that the relevant activity for which the Local charged him occurred on November 19, 2023—not November 18, as was the case in the original typed version.  Am. Comp. ¶ 51.  It then sent this fraudulently altered affidavit to Plaintiff and the union multiple times through email and postal service.  *Id.* ¶¶ 46–52, 251, 262.  But Plaintiff's complaint does not explain *how* altering the affidavit contributed to or aided the alleged fraud against him.  It does not explain how the Local's alteration to Roy's charging affidavit was material to the alleged larger scheme against him, nor does it connect the alleged acts of mail and wire fraud to the overall scheme besides alleging that the

Local sent the affidavit during the scheme. Even if the Local committed mail and wire fraud by sending Plaintiff and others Roy's charging affidavit after altering it illegally, Plaintiff also needed to explain why that change was material and therefore how it supported the overall scheme. *BancOklahoma*, 194 F.3d at 1102–03.

Relatedly, Plaintiff's allegations also fail to plausibly explain how the change the Local made to the affidavit indicates that it intended to defraud him. Mail and wire fraud require an intent to defraud. *United States v. Zander*, 794 F.3d 1220, 1230–31 (10th Cir. 2015) (quoting *United States v. Ransom*, 642 F.3d 1285, 1289 (10th Cir. 2011)). Plaintiff only alleges a single change to one affidavit. Upon first receiving Roy's affidavit describing his charges, he noticed that "[i]t state[d] inaccurately that the date [he] . . . discussed [Roy]'s porn activity" was Nov. 18, 2023—"but the '8' in the number 18 had a hand-scrawled '9' written on top of it, to reflect the true date [he] discussed [Roy]'s porn activity with [another vice president] as Nov. 19, 2023." Am. Comp. ¶ 50. He alleges that the Local later sent him a new copy of the affidavit with the November 19, 2023, date typed rather than handwritten, but backdated with Roy's signature to the date the Local originally sent him the affidavit with the handwritten alteration. *Id.* ¶ 52. In other words, the only change the Local made was handwriting a "19" where the drafter had originally typed an "18."

This minor change could not likely have contributed to any Local and the union attempt to defraud him because Plaintiff himself admits that November 19 was the correct date upon which the events alleged occurred. *Id.* ¶ 50. Any explanation provided for how this change supported the scheme ignores a far more likely one: that the Local simply mistyped the date on the affidavit and elected to fix it with pen. Altering an affidavit to make a change Plaintiff himself concedes is correct likely cannot support a plausible claim that the change and its subsequent transmission

through mail and wire supported the improper discipline against him. Plaintiff responds that "scienter in the RICO fraud context 'includes a scheme to deprive another of money [or] property,'" Plaintiff's Local Resp. at 12 (quoting Tenth Circuit Pattern Criminal Jury Instructions § 2.57 (2021)), and that he met this burden because the affidavit alteration "was only one misrepresentation among many that were made as part of a scheme . . . to deprive [him] of his elected office and the value of his union membership," *id.* (internal citations omitted). Plaintiff is incorrect. Defendants do not commit mail fraud simply by sending false statements through the mail; they must use the mails must have been used to further a scheme to defraud or obtain money or property through false pretenses. *See Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 892 (10th Cir. 1991). And Plaintiff never explained how changing the affidavit supported the scheme he alleges.

More broadly, the wire and mail fraud he pleads does not indicate an ongoing enterprise as required for a valid RICO claim. While some courts state that RICO requires "at least two predicate acts" to indicate an ongoing criminal conspiracy, such statements mislead some claimants into thinking two predicate acts necessarily suffice to create a pattern of racketeering activity. *Deck*, 349 F.3d at 1257 (citing *Resol. Tr.*, 998 F.2d at 1543). Two or more acts may illustrate a pattern, but a plaintiff must explain how they do so and how the alleged crimes connect to that larger scheme. *Sedima*, 473 U.S. at 496 n.14. Plaintiff says "the racketeering acts alleged are defendants' 'regular way of conducting a legitimate enterprise' because fraudulent allegations and abuse of process take place repeatedly in similar business settings, i.e., in the union disciplinary process." Plaintiff's Local Resp. at 9. His second amended complaint contains background information on other recent intra-union activities related to officers that criticized other officers that he says show "Ongoing Self-Dealing, Retaliatory Discipline and Undemocratic

Practices." Am Comp. ¶¶ 172–192. But that description does not explain how the mail and wire fraud related to the changed affidavit, the only racketeering activity Plaintiff alleges, connect to the overall scheme and the alleged pretrial consensus. Admittedly, describing what acts amount to a pattern of racketeering activity can be difficult. *H.J., Inc.*, 492 U.S. at 251–56 (Scalia, J., concurring). But Plaintiff did not attempt explaining how the two crimes at the heart of his RICO claims supported the overall scheme, and under any standard fails to state a claim. The Court grants the Local's motion to dismiss counts four and five.

## C. State Law Claims

Lastly, Plaintiff alleges two New Mexico state-law claims against only Roy for conduct that occurred parallel to the union and the Local's conduct. Plaintiff first claims that Roy "communicated false statements of fact about Plaintiff to third parties" with defamatory intent, specifically the statements she made both in the petition she submitted to support her request for a restraining order she sought against Plaintiff and at the union trial in which she accused him of "cyberstalking her" and distributing lewd images of her.[7] Am. Comp. ¶¶ 111–12, 171, 265–69. Plaintiff next claims that Roy maliciously abused the judicial process in seeking a restraining order against him despite knowing that the complaint lacked probable cause. *Id.* ¶¶ 156–71, 271–77.

### 1. Count Six: Defamation

Plaintiff's defamation claim fails as a matter of law. As with most states, New Mexico prohibits defamation claims based on statements made in a civil complaint or at a judicial or administrative hearing. *Helena Chem. Co. v. Uribe*, 281 P.3d 237, 241 (N.M. 2012); *Chavez-Neal*

---

[7] Plaintiff does not cite these specific statements under the defamation count, but he denies their truth, calls them slanderous, and cites them in his response brief discussing the count. ECF No. 39 ("Plaintiff's Roy Resp.") at 5, 13–17.

*v. Kennedy*, 485 P.3d 811, 814 (N.M. Ct. App. 2021). All the statements Plaintiff alleges are defamatory occurred in the charging affidavit Roy made with the Local, the complaint she filed in New Mexico state court, or her testimony at the Local's disciplinary trial.[8] Am. Comp. ¶¶ 53, 100–23, 156–71. New Mexico law protects these statements "even if false and malicious" so long as "the defamatory matter is 'reasonably related to the subject of inquiry.'" *Chavez-Neal*, 485 P.3d at 814 (quoting *Stryker v. Barbers Super Mkts., Inc.*, 462 P.2d 629, 631 (N.M. Ct. App. 1969)). The statements here are within the reasonable inquiry of both proceedings. Roy's claim that Plaintiff "was cyberstalking [her]," for example, came during her testimony as an explanation for why Plaintiff could not have known about her OnlyFans activities unless he did so. Am. Comp. ¶ 111. That was within the reasonable inquiry of a sexual-harassment hearing related to Roy's pornographic activities. Roy gets absolute immunity for it and other statements Plaintiff alleged.[9] The Court grants Roy's motion to dismiss count 6.

---

[8] Plaintiff cites examples in his complaint in which others read the statements Roy made in her charging affidavit at Local general members' meetings and an executive board meeting, seemingly arguing that these should not be given absolute immunity because they did not occur during a judicial or administrative hearing. Plaintiff's Roy Resp. at 4, 15–16 (citing Am. Comp. ¶¶ 39–40, 94, 156–71). But in those instances the relevant parties still read only from the charging affidavit, for which Roy has absolute immunity. No basis exists for inferring lack of absolute immunity in such a case.

[9] Although no New Mexico case law states directly that the absolute immunity applies in a non-judicial union disciplinary trial, the Tenth Circuit applied the privilege to an arbitration hearing between an employer and a union related to collective bargaining agreement terms. *Gen. Motors Corp. v. Mendicki*, 367 F.2d 66, 70–71 (10th Cir. 1966). That court, citing broader labor law principles, reasoned that employers and employees had to be free to speak their mind at the bargaining table, and extended the protection to such private meetings. *Id.* at 71. As Congress has protected union members' free speech rights with the LMRDA, the Court believes the same principles suggest that absolute immunity should also attach to all statements made in internal union trials, which Congress also determined benefit from free expression without punishment under the same terms as other absolute immunity applications.

2.  <u>Count Seven: Malicious Abuse of Judicial Process</u>

A valid malicious abuse of judicial process claim requires a plaintiff to show that "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009).  Plaintiffs adequately plead the first element by alleging the defendant "(1) fil[ed] a complaint without probable cause, or (2) [by describing] 'an irregularity or impropriety suggesting extortion, delay, or harassment.'" *Id.* (quoting *Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31, 35 (N.M. 2007)).  A lawsuit lacks probable cause if "the opponent did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim." *LensCrafters, Inc. v. Kehoe*, 282 P.3d 758, 766 (N.M. 2012) (quoting *DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277, 287 (N.M. 1997).  Actionable irregularities and improprieties "involve[] a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, [that] . . . indicate[] the wrongful use of proceedings, such as an extortion attempt." *Found. Mins., LLC v. Montgomery*, 562 P.3d 593, 605 (N.M. Ct. App. 2023) (quoting *Durham*, 204 P.3d at 26).

Plaintiff's malicious abuse of judicial process claim relies on various circumstantial indicia that indicate Roy intended only to waste his time in seeking a restraining order.[10]  He alleges that Roy lacked probable cause in filing her complaint, stating that Plaintiff had "stalk[ed] [her] online since 2021" despite having "absolutely no evidence to support" that claim and knowing so.  Am. Comp. ¶¶ 156–60.  Indeed, the complaint alleges that Roy's petition said Plaintiff "approached a female Vice President to show her [without] her consent a pornography website [with] pirated

---

[10] The Court construes Plaintiff's malicious abuse of judicial process claim to relate only to Roy's actions in seeking a restraining order, as he mentions only allegations related to that transaction in his response.  Plaintiff's Roy Resp. at 8–13.

images of [Roy]" even though at the Local trial the vice president "testified numerous times . . . that [Plaintiff] never showed [her] any nude or pornographic images." *Id.* ¶¶ 162–63. He also highlights an exhibit purportedly showing him stalking her, which he says shows him with "his back turned to the camera," having "been instructed [by the Exec. Board] to wait in the hallway while the Board entered executive session" to weigh the charges against him. *Id.* ¶ 165. So flimsy is this evidence, he suggests, that Roy must have known that her stalking claim lacked a basis. *Id.* ¶ 170.

As for suggested impropriety, Plaintiff focuses almost exclusively on how Roy dismissed the case. Roy did so one day before the Court held a hearing on her petition, stating that she did so because she was "no longer living in New Mexico." *Id.* ¶¶ 169. Plaintiff contends, however, that she still lived in New Mexico on that date, and continues to do so. *Id.* Even if she had not, Plaintiff contends, her reasoning would still not make sense because she "accused [him] of cyberstalking, which obviously can be perpetrated across state lines and long distances." *Id.* ¶ 171.

These allegations do not suggest that Roy lacked probable cause to file her petition. The complaint states that "the only fact alleged by Roy in her petition was that" Plaintiff showed another vice president "a pornography website [with] pirated images of [her]." *Id.* ¶ 162. Although Plaintiff says that vice president "earlier testified numerous times, in a trial Roy attended, that [Plaintiff] never showed [the vice president] any nude or pornographic images," *id.* ¶ 163, his own complaint says that he showed the vice president Roy's profile on a pornographic website, which contained an "above-the-shoulders profile photo, [Roy's] name, and a hyperlink that read, 'Hailey Josselyn's Naked Porn Videos,'" *id.* ¶ 29. It also says that the vice president "testified that [Plaintiff] showed her a screenshot of a porn site that appeared to show Roy." *Id.* ¶ 103. As Plaintiff argues, this may not support a stalking allegation sufficient to grant a restraining order.

*Id.* ¶¶ 156–58.  But his own complaint contradicts his allegation that Roy "did not hold a reasonable belief in the validity of the allegations of fact or law of the underlying claim," and therefore fails to state a claim.  *LensCrafters*, 282 P.3d at 766.

Plaintiff has, however, stated a claim for abuse of process based on alleged irregularity and impropriety.  New Mexico law makes clear that "the filing of a proper complaint . . . without any overt misuse of process, will not subject a litigant to liability for malicious abuse of process, even if it is the result of a malicious motive."  *DeVaney*, 953 P.2d at 285.  Contrary to Roy's argument, Plaintiff's allegations go beyond merely asserting malicious motive's elements.  Roy's Mot. at 8.  He alleges that Roy initiated the lawsuit solely to waste Plaintiff's time, withdrawing the lawsuit the day before a hearing by lying that she had moved out of New Mexico after making Plaintiff go through the expense of hiring an attorney and preparing for the hearing.  Am. Comp. ¶¶ 166–71.  In so doing, she allegedly submitted a photo that she knew could not support a stalking charge and about which she lied regarding the context.  *Id.* ¶¶ 165.  She allegedly sought and the court granted a continuance because "the evidence to support [her] claim was not provided until" the day of her motion, which the complaint alleges was a bad-faith ploy intentionally lengthened by her deliberate decision not to get the evidence from the Local until then.  *Id.*

This conduct, if true, suggests Roy used the legal system for an illegitimate end in ways accepted by other New Mexico courts as malicious abuses of the judicial process.  *See, e.g., Fleetwood Retail*, 164 P.3d at 40 (noting that a jury could find that a plaintiff that filed a lawsuit against a defendant solely to gather information on the defendant and then voluntarily dismissed the complaint could be found liable for malicious abuse of process).  If this was Roy's goal, Plaintiff also alleges it worked: he spent $5,000 to hire an attorney to defend against the suit.  Am. Comp. ¶ 166.  He has therefore alleged all elements of a malicious abuse of judicial process claim

with specificity and can proceed to discovery on this issue. The Court denies Roy's motion to dismiss count 7.

### D.  Conclusion

For the foregoing reasons, the Court GRANTS the Local, the union, and Roy's motions to dismiss for counts 3, 4, 5, and 6 with prejudice and DENIES their motions to dismiss for counts 1, 2, and 7.

IT IS SO ORDERED.

/s/ Joel M. Carson III
Joel M. Carson III
United States Circuit Judge
Sitting by Designation